UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| YALENA LOPEZ-LEWIS, as Administrator of the Estate of ANTOINE M. LEWIS Sr., deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | Case Number: 19-CV-4964 |
| v. | ) ) | |
| THE BOEING COMPANY., an Illinois corporation; and ROSEMOUNT AEROSPACE, INC. a Delaware corporation, | ) ) ) ) | |
| | ) | **Jury Demand** |
| Defendants. | ) | |

<u>COMPLAINT AT LAW</u>

Plaintiff YALENA LOPEZ-LEWIS, as Administrator of the Estate of ANTOINE M. LEWIS, Sr., deceased, by and through her attorneys, ROMANUCCI & BLANDIN, LLC, as and for her Complaint at law against the defendants, THE BOEING COMPANY ("Boeing"), and ROSEMOUNT AEROSPACE, INC. ("Rosemount") states as follows:

## I.   INTRODUCTION

This action arises out of the tragic death of Antoine M. Lewis, Sr. ("Antoine"), who died in the crash of Ethiopian Airlines Flight 302 (ET302) on March 10, 2019. He was 39-years-old. Antoine and his wife, Yalena Lopez-Lewis, had celebrated their first wedding anniversary just a few months prior. He had a 15-year-old son who lived with him in Canada, where he was stationed as an Officer in the United States Army. He had served his country for over 15 years across the world from Afghanistan to

Canada. Most recently, he was a Captain, eligible and seeking further advancement to the rank of Major. Antoine boarded ET302 to Kenya the morning of March 10, 2019—a connecting flight before his final departure back home. ET302 fell from the sky just six minutes into its flight, nosediving into the ground, and killing all 157 people aboard on impact, including Antoine.

The subject aircraft involved was a brand-new Boeing 737 MAX 8, the now-infamous series of Boeing aircraft that has been responsible for the deaths of 346 individuals around the world in the past nine months. This recently-delivered aircraft crashed as a result of, amongst other things, a new flight control system that automatically lowered the nose of the aircraft to prevent a stall; however, it actually plunged the aircraft into a nosedive toward the ground which resulted in excessive nose-down attitude, significant altitude loss, and, ultimately, a deadly crash.

Most shocking is that for months – potentially years – prior to this crash, Boeing knew about these risks but subverted them; misled the public, its investors, and its customers; failed to take adequate precautions; and failed to inform pilots of the new systems it had implemented. Indeed, Boeing intentionally concealed the following issues regarding the 737 MAX 8: (i) the absence of adequate safety features in the original 737 MAX design – an "angle of attack" indicator and a "disagree light" to prevent engine stalling; (ii) the compressed and "frenetic" time period for engineers to develop and design the new model; (iii) the absence of a manual override for pilots; (iv) software glitches in the Maneuvering Characteristics Augmentation System ("MCAS"); (v) Boeing's intent to avoid additional pilot training with introduction of

the new model; (iv) Boeing's efforts to reduce costs by charging extra for certain safety options (such as the angle of attack indicator and disagree light) and avoiding additional training; (vii) problems with Boeing's self-certification of the plane's safety features for purposes of FAA approval; and (viii) Boeing's failure to properly advise pilots and airlines of changes to the operating system that required updated procedures and training to cope with malfunctions associated with unexpected nose dives.

By placing profits over safety, by promoting its bottom line over human life, Boeing needlessly put the lives of countless passengers in grave peril, including Antoine's. As a result of Boeing's corporate greed and deception; reckless disregard for the well-being of its passengers; and gross negligence in its design, manufacture, and marketing of the 737 MAX 8, Antoine M. Lewis, Sr. died at the age of 39. That day, a wife lost her husband; a son lost his father; a country lost a hero. Boeing now must be held accountable for their actions and the untold harms they have caused.



## II.    JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this controversy under 28 U.S.C. § 1369, the Multiparty, Multiforum Trial Jurisdiction Act of 2002 (MMTJA).

2.    Because more than 75 persons died as a result of the crash of Ethiopian Airlines Flight 302 at the same location and in a location different than where Boeing or Rosemount resides and minimal diversity exists between the parties, pursuant to the MMTJA, this Court has original jurisdiction over this civil action.

3.    Boeing is and has, at all relevant times, been a citizen and resident of the State of Illinois because it maintains its principal place of business in Illinois. At all relevant times, Boeing has been authorized to do business, and has been transacting or conducting regular and substantial business, in the State of Illinois.

4.    Rosemount has, at all relevant times, transacted, and continues to transact, regular and substantial business with Chicago-based Boeing in the State of Illinois.

5.    Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(1) because Boeing resides in this judicial district as defined by 28 U.S.C. § 1391(c)(2).

## III.    THE PARTIES

6.    At all relevant times, the decedent, Antoine M. Lewis, Sr. was a citizen of the United States of America.

7.     At the time of his death, Antoine was serving his country as a Captain in the United States Army, stationed in Ottawa, Canada.

8.     At all relevant times, Antoine, was domiciled at his time of entry into the United States Army and had his home of record with the United States Army in the State of Illinois.

9.     Antoine's only surviving heirs are:

    a.     Yalena Lopez-Lewis, Antoine's wife, married on January 3, 2018;

    b.     Antoine's 15-year-old minor son, Doe Child.

10.     Yalena Lopez-Lewis was granted Letters of Administration by the State of Maryland on April 5, 2019.

11.     At all relevant times, Boeing was and is a for-profit, Delaware corporation with its principal place of business and executive offices located at 100 N. Riverside Plaza, Chicago, Illinois.

12.     At all relevant times, Boeing was and remains engaged in the business of designing, manufacturing, integrating, assembling, modifying, maintaining, inspecting, testing, servicing, marketing, and distributing aircrafts and their component parts, including Ethiopian Airlines Flight 302, a 737 MAX 8, registration ET-AVJ (hereinafter referred to as "Flight 302," the "subject crash" or subject aircraft").

13.     At all relevant times, Rosemount was and is a for-profit, Delaware corporation with its principal place of business located in Burnsville, Minnesota.

14.    At all relevant times, Rosemount was and remains engaged in the business of designing, manufacturing, and selling aerospace components for use in commercial airplanes, including the AOA sensors used in the Boeing 737 MAX 8 airplanes.

## IV.    FACTS COMMON TO ALL COUNTS

### A. Boeing – Generally

15.    Boeing designs, develops, manufactures, and sells, *inter alia*, commercial jetliners to governments and airline customers in over 150 countries.

16.    Boeing operates in four business segments: Commercial Airplanes, Defense, Space & Security; Global Services; and Boeing Capital. The Commercial Airlines segment provides commercial jet aircraft for passenger and cargo requirements, and fleet support services, principally to the commercial airline industry. Boeing holds its Commercial Airlines segment out as a leading producer of commercial aircraft offering a family of commercial jetliners designed to meet a broad spectrum of global passenger and cargo requirements of airlines. The family of commercial jet aircraft in production includes the 737 narrow-body model and the 747, 767, 777 and 787 wide-body models.

17.    Boeing has manufactured and delivered more than 10,000 aircraft in the 737 series.   Development of the 787 MAX 10 and certain 737 MAX derivatives continues, including but not limited to the 737 MAX 8 and 9.

18.    Boeing claims it manufactures safe products through the application of robust processes. The Company also claims that "*[s]afety is the primary consideration*

*when Boeing engineers design an airplane*. In addition to meeting regulatory requirements before certification, each airplane model must meet Boeing's time-proven design standards. Often these standards are more stringent than regulatory requirements." Further, the Company represents that "Boeing airplanes are rigorously tested to ensure they meet or exceed design standards and certification requirements." Additionally, the Company claims that it "develops and incorporates new technologies to enhance safety. Through research, development and collaboration, Boeing has developed sophisticated technologies that provide distinct safety advantages."

19. Profit, not safety, was Boeing's primary consideration when developing the 737 MAX 8.

## B. Boeing 737 MAX 8 background

20. In 2011, Boeing confronted a potential loss of one of its best customers, American Airlines. American Airlines was about to enter into an exclusive contract with Airbus to purchase hundreds of planes. In response, Boeing quickly commenced development on the 737 MAX series of planes.

21. To compete with Airbus, Boeing designed a remodeled 737 that required it to install new engines on the old airframe and a new computerized system (the MCAS) to prevent stalling. The 737 MAX is simply an upgraded version of earlier 737s and is designed to deliver improved fuel efficiency and lower operating costs. By August 2011, Boeing announced that it had orders for 496 new Boeing 737 MAX airliners.

22. Boeing gained FAA certification for the 737 MAX 8 on March 8, 2017.

23. The first commercially available 737 MAX 8 was delivered in May 2017. The 737 MAX included the new automated stall-prevention system, the MCAS, designed to prevent cockpit crews from mistakenly raising a plane's nose dangerously high. Upon delivery, Boeing touted the 737 MAX as "chang[ing] the face of the single-aisle market."

## C. Development of the MCAS Flight-Control System

24. Boeing's engineers modified earlier versions of the 737 and developed an automated stall-prevention system for the 737 MAX 8 and MAX 9 models. Boeing intended to assist pilots in avoiding raising a plane's nose to dangerously high angles. The new engines had to be mounted higher and more forward than did the original engines, which materially changed the balance and accordingly, the flight characteristics of the plane. As a result, the flight control systems were modified to manage the altered flight characteristics.

25. Because the engines were moved forward, the plane would tend to be more nose heavy, so the flight control systems had to be adapted to keep the nose up and maintain proper aerodynamics. This meant increasing the plane's "angle of attack" or the angle of the wing relative to the plane's vector, or direction of travel. If the angle of attack is too high relative to the speed of the plane, it can cause a disruption of the airflow over the wing, and a complete loss of lift, resulting in a "stall." When a stall occurs, the plane literally starts falling from the sky. The remedy

to prevent a stall from occurring is to lower the nose of the aircraft, reducing the angle of attack and re-establishing consistent airflow over the wing.

26.     Planes have sensors in the wings to warn of an impending stall, and commercial planes have systems that will automatically lower the nose in order to prevent a stall. Boeing designed the systems in the 737 MAX to offset the imbalance resulting from the placement of the new engines which had problems on takeoff – the time during which the angle of attack is the greatest. Sensors indicated danger of a stall and forced the nose of the plane down.

27.     During the development stage, reports purportedly stated that the new automated feature would, under certain circumstances, push the plane's nose down unexpectedly and strongly enough that pilots would be unable pull the nose back up – putting the aircraft in an uncontrollable nosedive. Boeing was aware of the problem and created a warning light system if a problem occurred with the angle-of-attack sensors on the 737 MAX. But rather than make that warning light system standard equipment on the plane, Boeing opted to make it an $80,000 optional add-on. A second feature to counter this problem, the "angle of attack" indicator, also was not part of the standard features but was an optional add-on for an additional cost to airlines.

### D. Practical Deficiencies with the MCAS Flight Control System

28.     If the angle of attack sensors detect that the plane is pitching too high, the MCAS automatically adjusts the tail's stabilizer—the horizontal part of the tail—

to level out the plane. In other words, the MCAS activates automatically (i.e., without the input of the pilot) to push the plane's nose down.



29.    Rather than rely on multiple sensors, the 737 MAX 8 relies only on the angle of attack sensors. However, if the angle of attack sensors feed faulty or contradictory data to the MCAS, the system can force the aircraft into an unwarranted dive.

30.    An undesired and unwarranted dive is never safe. At low altitudes, the problem is particularly dangerous because it makes it far less likely that pilots can fix the problem and recover from the steep dive before crashing.

31.    Electric trim control on the yoke may temporarily stop the MCAS-driven stabilizer movement. But the MCAS will activate again within a few seconds—forcing

the nose down—after the switches are released if the angle of attack is still sensed too high.

### E. The FAA Delegated Boeing Authority to Self-Audit and Approve Portions of the Amendment Certification Process

32.     Early in the certification of the 737 MAX, the FAA safety engineering team divided up the technical assessments that would be delegated to Boeing versus those that would be retained within the FAA. But, as certification proceeded, FAA managers urged its technical experts to speed up the process. Development of the MAX was lagging nine months behind the rival Airbus A320neo. Time was of the essence for Boeing. So, throughout the certification process, FAA technical experts were pressured by their superiors to delegate more and more authority to Boeing. In this atmosphere, the "System Safety Analysis" on the MCAS was delegated to Boeing.

33.     Boeing engineers authorized to work on behalf of the FAA developed the System Safety Analysis for the MCAS, a document which, in turn, was shared with foreign air safety regulators in Europe, Canada, and elsewhere in the world. The document contains several flaws.

34.     Boeing's original System Safety Analysis of the MCAS understated the power of the MCAS, which was designed to swivel the horizontal tail to push the nose of the plane down to avert a stall. When the planes later entered service, it became clear that the MCAS was capable of moving the tail more than four times farther than was stated in the original safety analysis document. Specifically, the limit to

how much the system could move the tail turned out to be 2.5 degrees, rather than a 0.6 degree limit as set out in the description Boeing provided to the FAA.

35.     Boeing knew that the limit was higher than that specified in the original safety analysis document before the subject aircraft entered service. Safety analyses are required to be updated to reflect the most accurate aircraft information following flight tests. The numbers should match whatever design was tested and fielded, but Boeing's final safety analysis was not updated to reflect the accurate limit and still contained the 0.6 degree limit.

36.     The System Safety Analysis also failed to account for how the system could reset itself each time a pilot responded, thereby missing the potential impact of the system repeatedly pushing the airplane's nose further downward. In other words, the 2.5-degree limit applies each time MCAS is triggered, and it can be triggered multiple times, compounding the power of the MCAS to send the plane into an unrecoverable dive. Every time pilots reset the switches on their control columns to pull the nose back up, MCAS would have kicked in again, allowing new increments of 2.5 degrees until the stabilizer was moved to a position that would cause the maximum possible push downward. At a limit of 2.5 degrees, two cycles of MCAS without correction would have been enough to reach the maximum nose-down effect. Put simply, the MCAS had unlimited authority to push the plane's nose down.

37.     The System Safety Analysis was also flawed in the way it assessed a potential failure of the MCAS system. As explained above, the MCAS relied on only one sensor system—the angle of attack sensor—to determine whether to activate.

Whether a system on a jet can rely on one sensor input, or must have two, is driven by the failure classification system in the system safety analysis. Virtually all equipment on any commercial airplane, including the various sensors, is reliable enough to meet the "major failure" requirement, meaning that it could cause physical distress to people on the plane, but not death, and that the probability of a failure is less than one in 100,000. Such systems are therefore typically allowed to rely on a single input sensor. But when the consequences are assessed to be more severe—either "hazardous failures" causing serious or fatal injuries to a small number of passengers or "catastrophic failures" causing the loss of the plane with multiple fatalities—a system must have multiple input channels in case one goes wrong.

38.     Boeing's System Safety Analyses assessed an MCAS failure as either a "major failure" or, sometimes, a "hazardous failure," in cases where the plane is in an extreme maneuver. Boeing knew or should have known that the failure to classify the MCAS's failure as catastrophic, and thereby include the necessary checks and redundancies, was likely to lead to injuries and deaths. Moreover, the MCAS did not even meet the requirements for a system with a hazardous failure rating. Despite the MCAS's assessment as a hazardous failure, it depended on the reading from a single angle-of-attack sensor (i.e., without any redundant input or check). Boeing could have designed the system to compare the readings from two angle-of-attack vanes, which would have indicated if one of them was faulty, but instead, the MCAS was designed to take a reading from only one of them. Alternatively, the system could have been designed to check that the angle-of-attack reading was accurate while the plane was

taxiing on the ground before takeoff, when the angle of attack should read zero. But Boeing did not design or integrate these measures to ensure the MCAS would only activate in response to an accurate reading.

39. On the date of the subject accident, Boeing had not included a description of the MCAS in the flight crew operations manual (FOM), which governs the master description of the aircraft for pilots. In other words, Boeing did not even notify pilots that the MCAS was operating on the MAX. It did not warn pilots that in certain circumstances it might cause the airplane to pitch down or force the airplane into a cycle of repeated dives. Nor did Boeing provide pilots with information about how to react to an MCAS that is forcing unwarranted and/or repeated dives.

40. Boeing's stance that the pilots did not need to know about the MCAS or be trained to use the new system allowed the MAX to earn a common "type rating" with existing 737 models, allowing airlines to minimize training of pilots moving from previous generations of the 737 series to the MAX. Minimizing MAX pilot transition training was an important cost saving for Boeing's airline customers, a key selling point for the jet.

**F. Warnings About Boeing's 737 MAX 8 Safety Flaw**

41. Pilots flying the Boeing 737 MAX 8 have repeatedly voiced safety concerns about the aircraft to federal authorities in the United States. The pilots'

complaints are available in a federal database where pilots can voluntarily report about aviation incidents without disclosing their name or employer.[1]

42.     In October 2018, a Boeing 737 MAX 8 captain reported that the auto throttles on the aircraft failed to move to the commanded position after takeoff and climb. The pilot explained that after the aircraft had begun to climb, he or she noticed a decrease in aircraft performance. The plane failed to climb, even though the auto throttles were engaged, and the pilot resolved the issue by manually positioning the thrust levers.

43.     In November 2018, another Boeing 737 MAX 8 captain expressed frustration that some systems, including the MCAS are not fully described in the FOM for the Boeing 737 MAX 8, which the pilot described as "inadequate and almost criminally insufficient." The pilot complained that it was "unconscionable" that Boeing and the FAA allowed pilots to fly the planes without adequate training or fully disclosing the information about how its systems were different from those on previous 737 models.

44.     In November 2018, a Boeing 737 MAX 8 first officer reported an altitude deviation due to an intermediate level off by the aircraft auto-pilot system. The flight crew was forced to intervene, but because of the delay in achieving the correct altitude, Air Traffic Control issued brief off-course vectors to the pilots and other aircraft in the area.

---

[1] https://www.dallasnews.com/business/airlines/2019/03/12/boeing-737-max-8-pilots-complained-feds-months-suspected-safety-flaw

15

45.     The same month, another Boeing 737 MAX 8 first officer reported that the aircraft had pitched nose down after the autopilot was engaged on departure. The GPWS (Ground Proximity Warning System)—the system designed to alert pilots if their aircraft is in immediate danger of flying into the ground or an obstacle—sounded, warning the pilots with the alert, "don't sink, don't sink." The captain was able to avoid catastrophe by immediately disconnecting the autopilot and pitching the aircraft into a climb.

### G. The Lion Air Crash

46.     On October 29, 2018, Lion Air Flight 610 took off from Soekamo-Hatta International Airport in Jakarta, Indonesia.  Minutes after takeoff, the Boeing 737 MAX 8 (the "Lion Air Jet") crashed into the Java Sea, killing all 189 passengers and crew. Immediately after the crash, authorities commenced numerous investigations to determine the cause of the crash.  Subsequent analyses indicated that the aircraft experienced problems with airspeed indicators and a related system that fed data to computers about the angle of the aircraft's nose.

47.     Investigators quickly focused on the MCAS flight-control system newly installed by Boeing on the 737 MAX 8 and MAX 9 airliners.  In an Aircraft Accident Investigation Report, dated October 29, 2018 (the "Indonesian Report"), Indonesian safety regulators found that the Lion Air Jet that crashed was unfit to fly on more than one occasion in the days leading up to its final flight.  Specifically, the Indonesian Report notes that the Lion Air Jet's maintenance logs reported problems with airspeed and altitude readings on four of the six flights operating during the

three days prior to the crash. In fact, the problems were serious enough that on the Lion Air Jet's second-to-last flight, from Bali to Jakarta the crew reported a "stick shaker activation", which warns of a stall. Furthermore, the troubles on the Bali-Jakarta flight came one day after one of the angle-of-attack sensors was replaced on the Lion Air Jet, again, after the crew reported similar serious safety issues. The Indonesian authorities further reported that this "condition is considered as an un-airworthy condition and the flight shall not be continued."

48.     John Goglia, a safety consultant and former member of the National Transportation Safety Board, stated that "[f]or three days, this plane was flying around when they knew there were problems." Goglia also stated that he has "grounded planes with much less serious conditions."

49.     On November 12, 2018, The Wall Street Journal published an article entitled "Boeing Withheld Information on 737 Model, According to Safety Experts and Others." The article attributed the Lion Air Jet crash to a new flight-control feature that Boeing implemented in its 737 MAX aircrafts. Citing "safety experts involved in the investigation, as well as midlevel [Federal Aviation Administration] officials," the article reported that Boeing "withheld information about potential hazards associated with a new flight-control feature suspected of playing a role in last month's fatal Lion Air jet crash." The article further reported that the focus of U.S. and Indonesian crash investigators had shifted to the way in which "MAX 8's automated flight-control systems interact with each other, and how rigorously the

17

FAA and Boeing analyzed potential hazards in the event some of them malfunction and feed incorrect or unreliable data to the plane's computers."

50.     It was further reported that Boeing did not inform airlines of this issue until a week after the accident in Indonesia, via a world-wide safety bulletin.

51.     Following the crash, Boeing continued to praise the airworthiness and safety of its MAX 8 planes and strongly denied that the Indonesian crash had anything to do with the plane's mechanics or operating systems. Boeing defended the plane's safety features and publicly resisted calls to make changes to its system and pilot training procedures. Boeing claimed it was "confident in the safety of the 737 MAX" and on December 6, 2019, Boeing's CEO, Dennis Muilenburg told CNBC that Boeing's "planes are safe".

52.     Despite these assurances, Boeing quietly began making design changes to the 737 MAX 8's automated flight control system, which it planned to implement by way of an MCAS "software update."

53.     Boeing failed to implement an MCAS software update prior to March 10, 2019.

**H. The manufacture and sale of the subject aircraft**

54.     Prior to the date of the subject accident, Boeing designed the subject aircraft, along with its component parts, in the United States.

55.     At all relevant times, Boeing marketed, manufactured, produced, assembled, and sold the subject aircraft in the United States.

56.    Boeing represents that the subject aircraft is airworthy, safe, reliable, and fit for its intended purposes.

57.    In or around November of 2018, Boeing delivered the newly manufactured subject aircraft to Ethiopian Airlines.

58.    Boeing sold and delivered the subject aircraft to Ethiopian Airlines, knowing that the subject aircraft would be used by Ethiopian Airlines for commercial flight operations, including scheduled passenger flights.

59.    At all relevant times, the subject aircraft was sold and delivered by Boeing without being altered by some other party and without substantial change in the condition in which it was sold and delivered, and it was being used as intended by, or in a manner that was reasonably foreseeable to, Boeing.

60.    Prior to March 10, 2019, Boeing designed, manufactured, assembled, and sold the subject aircraft and prepared, published, and provided to Lion Air information including, but not limited to, a 737 MAX 8 FOM regarding the operation of the subject aircraft.

61.    At the time the subject aircraft and its FOM left the custody and control of Boeing, they were defective and unreasonably dangerous in one or more of the following respects, among other defects:

    a.    The subject aircraft's defective anti-stall system, the MCAS caused the aircraft's nose to suddenly, without warning, drop and dive steeply, and said event could occur even while under manual control when a pilot would not reasonably expect a flight computer to override one's actions;

    b.    The scenario described in (a) above was not covered in the defective FOM, and Defendant Boeing did not disclose the foregoing or how to

recover the plane from the foregoing to Ethiopian Airlines pilots when Ethiopian Airlines purchased the subject aircraft;

c.  The subject aircraft received "erroneous input" from one of its defective angle of attack sensors;

d.  The scenario described in (c) above was not covered in the defective FOM, and Boeing did not disclose how to recover the plane from the foregoing to Ethiopian Airlines pilots when Lion Air purchased the subject aircraft;

e.  The subject aircraft and FOM lacked proper and adequate instructions and warnings regarding the design and functions of its MCAS system; and

f.  The subject aircraft and FOM lacked proper and adequate instructions and warnings regarding how to correct a malfunctioning MCAS system.

## I.  Ethiopian Airlines Flight 302 Crash

62.    On March 10, 2019, an Ethiopian Airlines Flight 302, a Boeing 737 MAX 8, was scheduled to depart from Addis Ababa to Nairobi, Kenya.  Flight 302 departed Addis Ababa Bole International Airport at 8:38 a.m. local time bound for Jomo Kenyatta International Airport in Nairobi, Kenya.

63.    Within a minute after takeoff, Flight 302's left angle of attack sensor recorded erroneous values and its left stall warning system (stick shaker) activated and remained active until near the end of the flight.

64.    Flight 302's flight data recorder later revealed that shortly after take-off, data from the airplane's left angle of attack sensor, designed, manufactured, and sold to Boeing by Rosemount, suddenly deviated significantly from the right angle of attack sensor data; the left angle of attack sensor data reached a maximum value of

74.5 degrees nose up, an erroneous and implausibly high nose angle of attack, while the right angle of attack sensor data reached a maximum value of 15.3 degrees.

65.     Flight 302 experienced airspeed, altitude and flight director pitch bar values on its left side that deviated from the airplane's right-side values, with the left side values measuring notably lower than the right-side values.

66.     The erroneous and implausible data transmitted by Flight 302's left AOA sensor, designed, manufactured, and sold to Boeing by Rosemount, indicated to the airplane's system that it was at an extreme nose high attitude and at risk of stalling, triggering the airplane's left stall warning system (stick shaker) to activate.

67.     The erroneous data from Flight 302's left angle of attack sensor also caused the airplane's MCAS to activate and command automatic nose down trim inputs.

68.     Flight 302's flight crew followed Boeing's recommended procedures; the airplane's cockpit voice recorder shows that the First Officer called out "stab trim cut-out" twice after the MCAS dove the airplane down toward the ground, followed by the captain's concurrence, indicating that the pilots shut off the electric trim.

69.     Flight 302's flight crew, however, found it impossible to manually control the forces on the airplane with the yoke.

70.     Despite both pilots desperately pulling back on the yoke and attempting to manually trim the airplane's nose together, they could not pull the airplane out of the MCAS-commanded dive.

71.     Shortly before the crash, Flight 302's pilots desperately reengaged the electric trim and began trimming the airplane's nose back up, but MCAS again activated and pushed the nose down.

72.     Upon information and belief, the false angle of attack reading from Rosemount's sensor on the subject aircraft triggered the automatic MCAS, which pushed up the forward edge of the stabilizers on the plane's tail and forced the plane's nose down.

73.     At 8:44AM local time, Flight 302 disappeared from radar and impacted terrain approximately 28 miles southeast of the airport, destroying the airplane and killing all 157 people on board, including Antoine M. Lewis, Sr.

74.     Flight 302 hit the ground with a nose-down dive angle of 40 degrees.

75.     Decedent Antoine M. Lewis, Sr. suffered extreme fear, pain and injuries before death, and multiple repeated painful and terrifying impacts prior to the final crash and death after Flight 302 crashed.

76.     Ethiopian Airlines in fact flew and used the subject aircraft for its normal and intended use – commercial aviation.

77.     In response to this crash, regulators worldwide almost immediately grounded all MAX 8 and MAX 9 jets until they could be deemed safe to fly.  Subsequent investigations by Ethiopian and other flight safety authorities revealed that the pilots followed Boeing's revised procedures without success as the faulty flight control system reactivated four times during the fatal descent.

78. As a direct and proximate result of one or more of the above-described defective and dangerous conditions in the subject aircraft which caused it to crash as described above, plaintiff, personally and on behalf of Antoine M. Lewis, Sr.'s lawful heirs, pursue this action for the injuries they suffered including unspeakable pain, suffering, loss of companionship, and loss of earnings and support, among all other damages available under the law.

<u>COUNT I</u>
STRICT PRODUCTS LIABILITY
(Pursuant to the Illinois Wrongful Death Act, 740 ILCS 1801, *et seq.*)
(Against Boeing)

79. Plaintiff realleges and incorporates by reference paragraphs 1 through 78 as though fully set forth herein as Paragraph 79.

80. At all relevant times, Boeing did design, manufacture, assemble, inspect, repair, endorse, draft, test, franchise, market, promote, advertise, supply, lease, distribute, and place into the stream of commerce the subject aircraft and FOM.

81. At the time the subject aircraft and FOM left the hands of Boeing, the subject aircraft, FOM, and the components alleged above, were defective and unsafe in manufacture, design, and warnings.

82. On or about March 10, 2019, Ethiopian Airlines and its officers, directors, employees, and/or agents and Antoine M. Lewis, Sr. were using the subject aircraft and FOM in a reasonable and foreseeable manner. Ethiopian Airlines and its officers, directors, employees, and/or agents and Antoine M. Lewis, Sr. were unaware that the subject aircraft was unsafe for its intended use. The defective and unsafe

23

conditions of aforesaid products caused the subject aircraft to plummet into an uncontrollable nosedive and crash. Antoine M. Lewis, Sr. was killed as a direct and legal result of the defective and unsafe conditions of said products and the component parts thereof.

83.     Boeing knew or should have known of the defects in the design and manufacture of the aforesaid products, which constitutes a hazard for those coming into contact with the aforesaid products and the component parts, and Boeing failed to notify, warn, and protect those coming into contact with the aforesaid products of the MCAS system, and such failure to warn was one of the legal causes of the incident and death of Antoine M. Lewis, Sr. The aforesaid products failed to perform as safely as an ordinary consumer would have expected when the subject aircraft plummeted into an uncontrollable nosedive and crashed.

84.     As a direct and legal result of the acts and omissions of Boeing, Antoine M. Lewis, Sr.'s heirs have been deprived of his love, care, society, comfort, assistance, protection, affection, companionship, guidance, solace, services, and support, and have thereby sustained, and will continue to sustain, pecuniary losses in a sum as yet unascertained.

**WHEREFORE**, Plaintiff requests that this Court grant judgment in her favor and against Defendant Boeing on Count I and award Plaintiff the following relief:

(1)     All damages available under the law in an amount to be determined at trial, including compensatory damages;

(2)     Interest in an amount to be determined by the Court;

(3)    Court costs in an amount to be determined by the Court; and

(4)    Such other relief as this Court deems appropriate and just.

<u>COUNT II</u>
**NEGLIGENT PRODUCTS LIABILITY**
**(Pursuant to the Illinois Wrongful Death Act, 740 ILCS 1801, *et seq*.)**
**(Against. Boeing)**

85.    Plaintiff realleges and incorporates by reference paragraphs 1 through 78 as though fully set forth herein as Paragraph 85.

86.    At all times herein mentioned, Boeing so negligently, carelessly, recklessly, and with gross negligence, designed, manufactured, assembled, inspected, repaired, maintained, endorsed, drafted, tested, franchised, supplied, sold, leased, distributed, and placed into the stream of commerce the subject aircraft and FOM, and negligently failed to warn, relative to the said products and the components alleged above, and otherwise so negligently conducted itself, so as to directly and legally cause the injuries and damages described herein to Plaintiff.

87.    At all times herein mentioned, Boeing knew, or in the exercise of reasonable care should have known, that the subject aircraft, the FOM and the components alleged above, were defectively and negligently manufactured, designed, assembled, tested, inspected, fabricated, constructed, distributed, marketed, and sold. Boeing failed to take reasonable steps to avoid exposing consumers, including Antoine M. Lewis, Sr., to the dangerous condition of such products, failed to disclose the products' known defects, failed to warn, failed to recall, failed to provide or send subsequent warnings after distribution to consumers, failed to warn Ethiopian

Airlines of the MCAS system, and otherwise so negligently conducted itself, so as to directly and legally cause the injuries and damages described herein to Yalena Lopez-Lewis personally as well as to those lawful heirs on whose behalf Plaintiff bring this action.

88.    On or about March 10, 2019, Ethiopian Airlines and its officers, directors, employees, and/or agents and Antoine M. Lewis, Sr. was using the subject aircraft and FOM in a reasonable and foreseeable manner. Ethiopian Airlines and its officers, directors, employees, and/or agents and Antoine M. Lewis, Sr. unaware that said products were unsafe for their intended use. The defective and unsafe conditions of the foregoing products caused the subject aircraft to fall into an uncontrollable nosedive and crash into the sea. Antoine M. Lewis, Sr. was killed as a result of the defective nature of the subject aircraft and FOM.

89.    Boeing had a duty, as a designer and manufacturer of goods, to manufacture, design, inspect, and test the subject aircraft and FOM to ensure they were safe for use by ordinary consumers.

90.    From the time the subject aircraft and FOM were delivered to Lion Air to the time of the crash, the aforesaid products were only used for their intended purpose and were not modified, upgraded, altered, damaged, or substantially changed in any way.

91.    As a direct and legal result of the acts and omissions of Boeing, Antoine M. Lewis, Sr.'s heirs have been deprived of his love, care, society, comfort, assistance, protection, affection, companionship, guidance, solace, services, and support, and

have thereby sustained, and will continue to sustain pecuniary loss in a sum as yet unascertained.

**WHEREFORE**, Plaintiff requests that this Court grant judgment in her favor and against Defendant Boeing on Count II and award Plaintiff the following relief:

(1)     All damages available under the law in an amount to be determined at trial, including compensatory damages;

(2)     Interest in an amount to be determined by the Court;

(3)     Court costs in an amount to be determined by the Court; and

(4)     Such other relief as this Court deems appropriate and just.

**COUNT III**
**FAILURE TO WARN**
**(Pursuant to the Illinois Wrongful Death Act, 740 ILCS 1801, *et seq.*)**
**(Against Boeing)**

92.     Plaintiff realleges and incorporates by reference paragraphs 1 through 78 as though fully set forth herein as Paragraph 92.

93.     At all relevant times, Boeing owed a duty to use reasonable care, and to exercise the highest degree of care, in planning, designing, certifying, manufacturing, assembling, installing, overhauling, modifying, repairing, testing, inspecting, marketing, and distributing its aircraft, including the subject aircraft, and its component parts, so as to not cause injury to, or the death of, the subject aircraft's passengers, including Antoine M. Lewis, Sr., who would put the subject aircraft to its normal and intended use.

94. Boeing negligently breached the duty of care it owed to Antoine M. Lewis, Sr. by negligently and carelessly designing the subject aircraft with unreasonably dangerous defects, by designing an unreasonably dangerous product that failed to perform in a manner reasonably to be expected in light of its nature and intended function, and by placing the subject aircraft into the stream of commerce with unreasonably dangerous design defects.

95. At all relevant times, the subject aircraft was sold and delivered by Boeing without being altered by some other party and without substantial change in the condition in which it was sold and delivered, and it was being used as intended by, or in a manner that was reasonably foreseeable to, Boeing.

96. At the time the subject aircraft left the custody and control of Boeing, at which point it entered the stream of commerce, and by and through the negligent actions or omissions of Boeing, the subject aircraft was defective in design, had inadequate warnings, and was unreasonable dangerous in the following ways, *inter alia*:

    a. the subject aircraft's automated flight control system, which is new and unique to the 737 MAX series, causes the aircraft to dive down automatically towards the ground in situations where such dives are unwarranted, unreasonably dangerous, and erroneous;

    b. the subject aircraft's electrical and computer components erroneously and automatically force the nose of the airplane down, causing it to dive, even when the aircraft is being flown manually by pilots;

    c. the subject aircraft's flight control system incorrectly and automatically operates the aircraft in such a way as to cause excessive nose-down inputs and significant altitude loss;

d. the subject aircraft's sensors are defective and generate false readings, including false readings related to the aircraft's angle of attack-the angle between the wing and the oncoming airflow-which triggers the aircraft's automated flight management and control systems to push the aircraft's nose downward;

e. the subject aircraft's lack of redundancies in its sensors renders it unreasonably dangerous because minor inputs and minor errors can force the aircraft into an uncontrollable nosedive;

f. the subject aircraft's defective sensors and flight control system cause the aircraft's control yolk to feel different from the yolks used for training the users of the 737 MAX series, which cause the subject aircraft's pilots to be confused and unable to correct the subject aircraft's automatic dive;

g. Boeing failed to mitigate the 737 MAX 8's dangers by enabling a second, already existing sensor at the front of the plane, which would have alerted the pilot to any inconsistencies between the sensors-Boeing chose to make this an optional add-on that cost airlines an additional premium to use;

h. Boeing failed to warn the airlines, pilots, users, and intended third-party beneficiaries of the defective automation that causes the subject aircraft to dive, Boeing failed to warn of the defective sensors, and Boeing failed to warn and educate users on possible manual overrides to the subject aircraft's defective system; and

i. Boeing failed to adequately test the subject aircraft, its flight control system, and its sensors, and Boeing failed to substantiate the changes to its previous 737 models with sufficient testing and data.

97. At all relevant times, Boeing negligently failed to warn the public, the airlines, the pilots, the users, and the intended third-party beneficiares of the 737 MAX 8's unreasonable dangerous and defective design, including the aircraft automatically and uncontrollably dived partly because of erroneous sensors.

29

98.     At all relevant times, the subject aircraft failed to perform in a manner reasonably expected given its nature and intended purpose, as alleged herein.

99.     The subject aircraft was not reasonably safe as designed. At the time of its manufacture, the likelihood that the subject aircraft would cause injury or death to passengers aboard the subject aircraft, including Antoine M. Lewis, Sr., and considering the seriousness of the harm, outweighed the burden on Boeing of designing the subject aircraft in a way that would have prevented those harms, including the burden of issuing adequate warnings of such defects.

100.    At all relevant times, Boeing had the capability to mitigate the 737 MAX 8's risks by enabling a second, already existing sensor at the front of the plane. This sensor, called a "disagree light," would alert the pilot to any inconsistent readings between the sensors. Upgrading the aircraft's software to enable this sensor would have cost Boeing almost nothing and would not have presented a significant burden to them. Boeing, however, chose to make this an optional add-on feature and charge airlines a premium cost for its use. Boeing then failed to issue adequate warnings of the risks that accompanied not paying this premium.

101.    The defects in the design of and warnings for the subject aircraft caused the subject crash, which directly, proximately, and foreseeably caused the deaths of everyone aboard the subject aircraft, including Antoine M. Lewis, Sr.

102.    As a direct and legal result of the acts and omissions of Boeing, Antoine M. Lewis, Sr.'s heirs have been deprived of his love, care, society, comfort, assistance, protection, affection, companionship, guidance, solace, services, and support, and

have thereby sustained, and will continue to sustain pecuniary loss in a sum as yet unascertained.

**WHEREFORE**, Plaintiff requests that this Court grant judgment in her favor and against Defendant Boeing on Count III and award Plaintiff the following relief:

(1)     All damages available under the law in an amount to be determined at trial, including compensatory damages;

(2)     Interest in an amount to be determined by the Court;

(3)     Court costs in an amount to be determined by the Court; and

(4)     Such other relief as this Court deems appropriate and just.

**COUNT IV**
**CIVIL CONSPIRACY**
**(Pursuant to the Illinois Wrongful Death Act, 740 ILCS 1801, *et seq.*)**
**(Against Boeing)**

103.    Plaintiff realleges and incorporates by reference paragraphs 1 through 78 as though fully set forth herein as Paragraph 103.

104.    Boeing conspired with and assented to a scheme, device, plan, and agreement with other entities and individuals, including the FAA and/or personnel delegated authority by the FAA, to certify the Boeing 737 MAX series in violations of the laws and regulations of the United States for the purpose of speeding up the approval process of the Boeing 737 MAX series, which, in turn, gave Boeing a financial and competitive advantage in the aviation industry.

105.    Boeing and these other entities and individuals engaged in concerted actions to conceal, deny, and downplay the hazards and safety concerns, in violation

of federal regulations, presented by the Boeing 737 MAX 8's new features, including its MCAS, heavier and repositioned engines, and unstable aerodynamics.

106.    Boeing took overt tortious and/or unlawful actions in furtherance of the conspiracy by failing to correctly classify the safety concerns presented by the MCAS; by failing to adhere to industry standards and regulations in designing and testing the 737 MAX; by failing to recuse itself from the certification process when it knew or should have known that it was acting under tremendous financial pressure to certify the 737 MAX promptly; and by applying pressure, whether directly or indirectly, to the Boeing personnel that had been delegated regulatory authority to certify the 737 MAX without appropriate testing and data, and in a rushed manner.

107.    As a direct and legal result of the acts and omissions of Boeing, Antoine M. Lewis, Sr.'s heirs have been deprived of his love, care, society, comfort, assistance, protection, affection, companionship, guidance, solace, services, and support, and have thereby sustained, and will continue to sustain pecuniary loss in a sum as yet unascertained.

**WHEREFORE**, Plaintiff requests that this Court grant judgment in her favor and against Defendant Boeing on Count IV and award Plaintiff the following relief:

(1)    All damages available under the law in an amount to be determined at trial, including compensatory damages;

(2)    Interest in an amount to be determined by the Court;

(3)    Court costs in an amount to be determined by the Court; and

(4)    Such other relief as this Court deems appropriate and just.

## COUNT V
## STRICT PRODUCTS LIABILITY
### (Pursuant to the Illinois Wrongful Death Act, 740 ILCS 1801, *et seq.*)
### (Against Rosemount)

108.    Plaintiff realleges and incorporates by reference paragraphs 1 through 78 as though fully set forth herein as Paragraph 108.

109.    At all relevant times, Rosemount was a designer, manufacturer, and seller of aerospace products, including AOA sensors.

110.    Rosemount designed, tested, manufactured, and sold the AOA sensors installed in the Boeing's 737 MAX 8 airplanes, including the subject aircraft.

111.    At the time that Boeing sold the subject aircraft to Ethiopian Airlines, the airplane was defective and unreasonably dangerous in one or more of the following respects:

   a.  The subject aircraft included AOA sensors sold by Rosemount that were subject to an unacceptable rate of failure; and

   b.  The subject aircraft included AOA sensors sold by Rosemount that provided erroneous and implausible data that triggered the airplane's left stall warning system and MCAS, causing the airplane to depart controlled flight and crash.

112.    At the time Rosemount sold the AOA sensors installed on the subject aircraft to Boeing they were defective and unusually dangerous in their condition as not altered prior to the crash.

113.    As a direct and proximate cause of the defective condition of the subject aircraft's AOA sensors, the subject aircraft departed controlled flight and crashed,

causing the death of Antoine M. Lewis, Sr. and the damages suffered by his surviving heirs.

114.    By reason of the foregoing, the AOA sensors installed on the subject aircraft were unreasonably dangerous and defective and Rosemount should be held strictly liable for the death of Antoine M. Lewis, Sr. and all damages suffered by his surviving heirs.

115.    As a direct and legal result of the acts and omissions of Rosemount, Antoine M. Lewis, Sr.'s heirs have been deprived of his love, care, society, comfort, assistance, protection, affection, companionship, guidance, solace, services, and support, and have thereby sustained, and will continue to sustain pecuniary loss in a sum as yet unascertained.

**WHEREFORE**, Plaintiff requests that this Court grant judgment in her favor and against Defendant Rosemount on Count V and award Plaintiff the following relief:

(1)    All damages available under the law in an amount to be determined at trial, including compensatory damages;

(2)    Interest in an amount to be determined by the Court;

(3)    Court costs in an amount to be determined by the Court; and

(4)    Such other relief as this Court deems appropriate and just.

<u>COUNT VI</u>
<u>NEGLIGENCE</u>
(Pursuant to the Illinois Wrongful Death Act, 740 ILCS 1801, *et seq.*)
(Against Rosemount)

116.    Plaintiff realleges and incorporates by reference paragraphs 1 through 78 as though fully set forth herein as Paragraph 116.

117.    At all relevant times, Rosemount owed a duty to the passengers and flight crews of Boeing 737 MAX 8 airplanes to use reasonable care in designing, manufacturing, assembling, and testing the AOA sensors installed on those airplanes, including the subject aircraft, so as to not cause injury and death.

118.    Rosemount breached its duty to the passengers and crew of ET302 in designing and manufacturing the AOA sensors installed on ET302 and in its work with Boeing them into the airplane.

119.    As a direct and legal result of one or more of Rosemount's negligent acts and omissions, the subject aircraft crashed killing Antoine M. Lewis, Sr. and all others on board.

120.    As a direct and legal result of the acts and omissions of Rosemount, Antoine M. Lewis, Sr.'s heirs have been deprived of his love, care, society, comfort, assistance, protection, affection, companionship, guidance, solace, services, and support, and have thereby sustained, and will continue to sustain pecuniary loss in a sum as yet unascertained

**WHEREFORE**, Plaintiff requests that this Court grant judgment in her favor and against Defendant Rosemount on Count VI and award Plaintiff the following relief:

(1)     All damages available under the law in an amount to be determined at trial, including compensatory damages;

(2)     Interest in an amount to be determined by the Court;

(3)     Court costs in an amount to be determined by the Court; and

(4)     Such other relief as this Court deems appropriate and just.

### DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues herein so triable.

Dated: July 24, 2019                              Respectfully Submitted,

                                                  ROMANUCCI & BLANDIN, LLC

                                                  By:/s/ Antonio M. Romanucci
                                                      Attorney for the Plaintiff

Antonio M. Romanucci
Robert S. Baizer
David A. Neiman
Bryce T. Hensley
**ROMANUCCI & BLANDIN, LLC**
321 N. Clark St., Suite 900
Chicago, IL  60654
Tel: (312) 458-1000
Fax: (312) 458-1004
aromanucci@rblaw.net
rbaizer@rblaw.net
dneiman@rblaw.net
bhensley@rblaw.net

Steven A. Hart
John S. Marrese
Jonathan O. Emmanuel
**HART MCLAUGHLIN & ELDRIDGE**
22 W. Washington Street, Suite 1600

Chicago, IL 60602
Tel: (312) 955-0545
Fax: (312) 971-9243
shart@hmelegal.com
jmarrese@hmelegal.com
jemmanuel@hmelegal.com

Andrew Kryder
**THE KRYDER LAW GROUP**
134 N. LaSalle Street, Suite 1515
Chicago, IL 60602
Tel: (312) 223-1700
Fax: (312) 377-1771
kryderlaw@gmail.com